```
              IN THE UNITED STATES DISTRICT COURT
               FOR THE SOUTHERN DISTRICT OF OHIO
                         EASTERN DIVISION


John F. Johnson,               :

        Plaintiff,             :

     v.                        :    Case No. 2:13-cv-0105

Commissioner of Social         :    JUDGE MICHAEL H. WATSON
   Security,                        Magistrate Judge Kemp
                               :
        Defendant.
```

REPORT AND RECOMMENDATION

I.   Introduction

Plaintiff, John F. Johnson, filed this action seeking review of a decision of the Commissioner of Social Security denying his applications for disability insurance benefits and supplemental security income.  Those applications were filed on August 24, 2009 and August 17, 2009, respectively, and alleged that plaintiff became disabled on June 5, 2009.

After initial administrative denials of his applications, plaintiff was given a videoconference hearing before an Administrative Law Judge on September 7, 2011.  In a decision dated November 15, 2011, the ALJ denied benefits.  That became the Commissioner's final decision on December 13, 2012, when the Appeals Council denied review.

After plaintiff filed this case, the Commissioner filed the administrative record on April 15, 2013.  Plaintiff filed his statement of specific errors on May 14, 2013.  The Commissioner filed a response on August 2, 2013.  Plaintiff filed a reply brief on August 9, 2013, and the case is now ready to decide.

II.   Plaintiff's Testimony at the Administrative Hearing

Plaintiff, who was 44 years old at the time of the administrative hearing and who has an associate's degree,

testified as follows.  His testimony appears at pages 46-70 of the administrative record.

Plaintiff testified that he was in an accident in 2003. Since that time, he has had surgery, has had to wear a knee brace and an ankle brace, and has seen his weight rise from around 200 pounds to over 300 pounds.  He has also had to live with his mother since that time.

Plaintiff could drive but due to difficulty sitting had trouble with long-distance driving.  He could only sit for 20-30 minutes at a time before needing to get up and stretch.  His father brought him to the hearing.

Plaintiff's last job was as a deliveryman for Sears.  His duties including driving a truck and loading appliances.  In August, 2003, he was hit by a car at a racetrack.  Subsequently he attended college and worked as a substitute aide in a public school.  He has an associate's degree in parks, recreation and wildlife.  He did look for work immediately after graduation but any available jobs were far from his home, and he had more surgeries as well.  Since then, his arthritis has worsened and his weight has continued to rise.  Other jobs he held in the past included gas station cashier and heavy work cutting up metal with a cutting torch.  He had also worked in a factory and as a welder.

The worst physical problem plaintiff had was the pain in his left knee.  He had two surgeries and had been advised he could not have a knee replacement until he was in his fifties.  He could not walk more than 40 yards or stand more than fifteen or twenty minutes.  He also could not stand more than an hour total in a work day.  He had a similar issue with his right ankle, was limited in the use of his arms (both were broken in the accident), and had problems using his right hand due to nerve damage.  He had plates and screws in both arms.  Finally, he had

constant pain in his low back.

As far as activities around the home went, plaintiff could ride a riding mower, do dishes and do laundry.  He cooked, but needed to sit while doing so.  He had become depressed from being unable to work or care for his children in the same way he did before the accident.

Plaintiff was asked if he could do a job like teacher's aide.  He said that he could not do the sitting, standing and moving around required for that job.  He also tended to avoid social situations.  He did grocery shopping but rode in the cart.  He described his pain level as five out of ten when he took medication, and eight of out ten when he did not.  He did not take his pain medication on the days he had to care for his children.

### III.  The Medical Records

The medical records in this case are found beginning on page 269 of the administrative record.  The pertinent records can be summarized as follows.

According to the first several hundred pages of records, plaintiff was treated at the emergency room of the Ohio State University Hospital on August 30, 2003 after having been struck by the pace car at a racetrack.  His diagnoses included multiple fractures.  He was admitted to trauma surgery for further treatment.  He had multiple surgeries to repair fractures of the hip and arm and was discharged to rehabilitation after seventeen days in the hospital.  After discharge, plaintiff was diagnosed with a left knee injury as well, and he developed some radial nerve palsy in his right arm.  He had surgery in early 2004 on his knee for multi-ligament reconstruction.  Subsequently he had a bone graft in his left arm, but by then he was back working at the racetrack.

After a gap of several years, the medical records show that

on May 5, 2009, he returned to see Dr. Phieffer, who had done most of the post-accident surgeries, reporting that he had fallen on a golf course on March 30, 2009 and was experiencing increased pain in his groin area.  He had gained 70 pounds in the past year.  He also said he was having difficulty standing or walking far distances and that he had been on and off pain medication for several years.  He was prescribed an anti-inflammatory.  An MRI of his right ankle done later that year showed evidence of a previous ligament strain and osteoarthritic and post-traumatic changes, as well as some defects and chronic plantar fasciitis. He then underwent surgery to remove loose bodies and osteophytes from the ankle.  Also in 2009, plaintiff had surgery for a left knee meniscal tear and arthroscopic surgery on his right knee. By early 2010, his ankle was much better.  Later on, however, he continued to report pain in that ankle which limited his ability to stand or walk.

     Plaintiff saw Floyd Sours, a psychologist, on September 23, 2009 for a consultative examination.  He reported constant depression and Mr. Sours diagnosed major depression.  He rated plaintiff's GAF at 65 and thought that plaintiff would have a mild impairment in the area of attention and withstanding ordinary work stress.  (Tr. 463-66).  VA treatment records from about the same time indicate a diagnosis of adjustment disorder with depressed mood and a GAF of 60.  A state agency reviewer, Dr. Rudy, assessed plaintiff's mental impairment as "not severe." (Tr. 518).  That opinion was later concurred in by Dr. Steiger, another state agency reviewer.  (Tr. 670).  However, Dr. Yee, who assessed plaintiff for the Muskingum County Department of Job and Family Services, completed a form on September 23, 2010, noting that plaintiff had moderate limitations in multiple areas of work functioning, including maintaining attention and concentration, keeping to an expected work schedule, and completing a normal

work day or week without interruptions from psychologically-based symptoms. (Tr. 706). Dr. Yee rated plaintiff's GAF at 67 but also said that plaintiff would benefit from treatment with psychotherapy and medication and that his "mood symptoms" were "currently work prohibitive." (Tr. 707-15).

On December 18, 2009, Dr. Caldwell, a non-examining source, expressed the opinion that plaintiff could do a fairly wide range of light work, with some restrictions in balancing and stooping. She found his subjective report of symptoms only partially credible in light of the objective findings in the record. (Tr. 556-63). One of plaintiff's treating sources, Dr. Calhoun, provided a different opinion on August 1, 2011, stating that plaintiff could not do even sedentary work due to problems with his ankle, back, and knee, and that he could stand or walk less than two hours and sit less than six hours in a work day. (Tr. 695-98). Another examining source, Dr. Dunmeyer, viewed plaintiff as even more limited, stating that he could only sit for a total of one hour during a work day and could stand or walk for the same amount of time. Dr. Dunmeyer said plaintiff also had a number of marked or extreme limitations on work functions such as pushing and pulling, bending, reaching, handling, and making repetitive foot movements. (Tr. 716-17).

The final set of records include a diagnostic assessment and treatment notes from Thompkins Child & Adolescent Services, Inc. Those notes showed a diagnosis of depression, a GAF of 50, and the fact that plaintiff was receiving counseling for depression in 2012.

### IV. The Vocational Testimony

A vocational expert, Mr. Rosenthal, also testified at the administrative hearing. His testimony begins at page 68 of the record.

Mr. Rosenthal characterized plaintiff's past work, beginning

in 1996, as an industrial cleaner (medium and unskilled), cashier (light and semiskilled), welder (medium and skilled), bending machine operator (medium and unskilled), burner (medium and unskilled, although plaintiff performed it at the heavy exertional level), landscape laborer (heavy and unskilled), restaurant cook (light and semiskilled), merchandise deliverer (medium and unskilled), and teacher aide II (light and semiskilled).

    Mr. Rosenthal was asked some questions about a hypothetical person who could perform a limited range of light work, being able to stand or walk for only two hours a day, and being unable to climb ladders, ropes or scaffolds. That person could occasionally climb stairs and ramps, balance, and kneel, and could not work on uneven terrain or around hazards like unprotected heights and dangerous machinery. Finally, the person could push, pull and operate foot controls frequently and could not do forceful grasping with the non-dominant hand. Mr. Rosenthal first testified that someone with those restrictions could do some cashier jobs, but later agreed that the amount of standing or walking probably excluded those jobs, and that plaintiff could not do any of his past relevant work. However, that person could do certain sedentary jobs such as order clerk or stuffer.

    Mr. Rosenthal was then asked to assume that the person could stand for less than two hours and day and sit for less than six, and could never climb, kneel, crouch or crawl. He testified that such a person could not work competitively. The same would be true for someone who had to change positions at least every thirty minutes.

                    V.   The Administrative Law Judge's Decision

    The Administrative Law Judge's decision appears at pages 13 through 26 of the administrative record. The important findings

-6-

in that decision are as follows.

The Administrative Law Judge found, first, that plaintiff met the insured requirements for disability benefits through September 30, 2010. Next, plaintiff had not engaged in substantial gainful activity from his alleged onset date of June 5, 2009 through the date of the decision. As far as plaintiff's impairments are concerned, the ALJ found that plaintiff had severe impairments including "right ankle osteoarthritis with OCD lesion Talus and Plafond status post open debridement and drilled, status post surgery to repair broken pelvis, obesity, obstructive sleep apnea, status post closed reduction with percutaneous pinning of the left distal radius fracture, and status post left knee repair." (Tr. 15). The ALJ also found that these impairments did not, at any time, meet or equal the requirements of any section of the Listing of Impairments (20 C.F.R. Part 404, Subpart P, Appendix 1).

Moving to the next step of the sequential evaluation process, the ALJ found that plaintiff had the residual functional capacity to perform a reduced range of light work but was limited to standing or walking two hours in an eight-hour workday, could never climb ladders, ropes or scaffolds, could occasionally climb ramps and stairs, balance, and kneel, could not work on uneven terrain or around hazards, could frequently push, pull and operate foot pedals with his lower extremities, and could not perform forceful grasping with his left hand. The ALJ found that, with these restrictions, plaintiff could perform those jobs identified by Mr. Rosenthal (order clerk and stuffer), and that such jobs existed in significant numbers in the regional and national economies. Consequently, the ALJ concluded that plaintiff was not entitled to benefits.

## VI. Plaintiff's Statement of Specific Errors

In his statement of specific errors, plaintiff raises two

issues.  He argues that (1) the ALJ did not properly evaluate the certain medical opinions; and (2) the ALJ failed to consider plaintiff's depression and anxiety as severe impairments.  The Court generally reviews the administrative decision of a Social Security ALJ under this legal standard:

<u>Standard of Review.</u>  Under the provisions of 42 U.S.C. Section 405(g), "[t]he findings of the Secretary [now the Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive. . . ."  Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion'"  <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971) (quoting <u>Consolidated Edison Company v. NLRB</u>, 305 U.S. 197, 229 (1938)).  It is "'more than a mere scintilla.'" <u>Id</u>.  <u>LeMaster v. Weinberger</u>, 533 F.2d 337, 339 (6th Cir. 1976).  The Commissioner's findings of fact must be based upon the record as a whole.  <u>Harris v. Heckler</u>, 756 F.2d 431, 435 (6th Cir. 1985); <u>Houston v. Secretary</u>, 736 F.2d 365, 366 (6th Cir. 1984); <u>Fraley v. Secretary</u>, 733 F.2d 437, 439-440 (6th Cir. 1984).  In determining whether the Commissioner's decision is supported by substantial evidence, the Court must "'take into account whatever in the record fairly detracts from its weight.'" <u>Beavers v. Secretary of Health, Education and Welfare</u>, 577 F.2d 383, 387 (6th Cir. 1978) (quoting <u>Universal Camera Corp. v. NLRB</u>, 340 U.S. 474, 488 (1951)); <u>Wages v. Secretary of Health and Human Services</u>, 755 F.2d 495, 497 (6th Cir. 1985).  Even if this Court would reach contrary conclusions of fact, the Commissioner's decision must be affirmed so long as that determination is supported by substantial evidence.  <u>Kinsella v. Schweiker</u>, 708 F.2d 1058, 1059 (6th Cir. 1983).

  A. <u>Treating and Examining Source Opinion Evidence</u>

The first issue raised in plaintiff's statement of errors relates to the ALJ's evaluation of opinions expressed by Dr.

-8-

Calhoun, the treating source, and Dr. Dunmeyer, an examining source. Any discussion about whether an ALJ properly evaluated the opinion of a treating source must begin with the ALJ's decision on that issue. Since Dr. Calhoun was the only treating source who rendered an opinion about plaintiff's residual functional capacity, the Court will first examine the way in which the ALJ analyzed Dr. Calhoun's opinion.

The entire discussion of Dr. Calhoun's opinion appears at pages 23-24 of the record. There, after describing the limits which Dr. Calhoun indicated in his August 1, 2011 report (less than two hours of walking or standing and less than six hours or walking in a workday, and some additional postural limitations), the ALJ stated:

> The undersigned considered the opinion but discounted it based on being too limited. The longitudinal medical history shows that he [plaintiff] is able to stand and/or walk at least two hours in an eight-hour day and perform greater postural activities than noted by Dr. Calhoun. Moreover, Dr. Calhoun's own findings do not support this extreme of limitations.

This discussion is certainly brief. Plaintiff argues not only that it is inadequate under <u>Wilson v. Comm'r of Social Security</u>, 378 F.3d 541, 544 (6th Cir. 2004), which explains how and why an ALJ must articulate his or her reasons for rejecting a treating physician's opinion, but it suffers from other failings as well. First, plaintiff contends that the ALJ did not follow the proper sequence for evaluating a treating source opinion, which involves a determination of whether that opinion should be given controlling weight based on how well-supported it is and how consistent it is with the other medical evidence of record, and, if controlling weight is not assigned, an evaluation under the various factors set forth in 20 C.F.R. §404.1527 and a determination of how much weight to give the opinion. Plaintiff also argues that the ALJ's citation to the "longitudinal medical

history" appears to refer not to any specified part of the record but rather to the ALJ's interpretation of that history, and points out that there are no contradictory medical opinions because the only other examiner's opinion in the record, that of Dr. Dunmeyer, is actually more restrictive than Dr. Calhoun's. Implicit in this argument is the contention that the ALJ improperly substituted his own opinion on medical issues for that of the treating or examining doctors, because there is no medical opinion credited by the ALJ which supports his interpretation of the evidence.

These arguments all find support in the brevity of the ALJ's discussion of Dr. Calhoun's opinion; the fact that the ALJ did not specifically identify him in that discussion as a treating source; the ALJ's failure to acknowledge or purport to follow the methodology and criteria set forth in the applicable regulation; and the fact that the only medical opinion which attributed greater abilities to plaintiff than Dr. Calhoun's was from Dr. Caldwell, the state agency reviewer - but the ALJ specifically found that Dr. Caldwell's opinion was "not supported by the objective medical evidence and is inconsistent with the findings of acceptable medical source (sic) in the longitudinal medical history" and he gave it "little weight." Tr. 23.  Against these arguments, the Commissioner offers the following.

According to the Commissioner, the ALJ's treatment of Dr. Calhoun's opinion was proper because the medical evidence, as a whole, coupled with the evidence of plaintiff's daily activities, shows that the limitations imposed by Dr. Calhoun were, as the ALJ put it, "extreme."  The Commissioner's memorandum cites to a wealth of evidence that, although it was recounted in the ALJ's opinion when he described the medical evidence, was not referred to in any specific way when the ALJ explained why he discounted Dr. Calhoun's views.  As plaintiff points out in his reply memorandum, the Commissioner also fails to address the argument

-10-

that the ALJ did not discuss the factors relating to whether to give a treating source opinion controlling weight.

There are a multitude of reasons why the Court finds the ALJ's discussion of Dr. Calhoun's opinion to be insufficient. First and foremost, it does not come close to complying with the articulation requirement found in 20 C.F.R. §404.1527(c)(2) as interpreted by the Court of Appeals in Wilson and subsequent decisions.  As Wilson noted, SSR 96-2p sets out that requirement clearly, stating that the ALJ's decision "must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." Id. at 544.  The ALJ's vague reference to the "longitudinal medical treatment," without more, gives no guidance to this Court about what portion of that treatment the ALJ found to be inconsistent with Dr. Calhoun's opinion, nor even what records created by which physicians contain that information.

The ALJ's discussion of Dr. Calhoun's opinion also runs afoul of the Court of Appeals' later decision in Blakely v. Comm'r of Social Security, 581 F.3d 399, 406 (6th Cir. 2009). Blakely makes clear that when, as here, an ALJ does not give controlling weight to an opinion from a treating source, "the ALJ must still determine how much weight is appropriate by considering a number of factors, including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and any specialization of the treating physician."  The administrative decision in this case is completely silent as to a majority of these factors, and there is no way for the Court to know that the ALJ actually considered them or followed the proper

-11-

regulatory decision-making process. Further, the Court agrees with plaintiff that the arguments advanced by the Commissioner are, for the most part, impermissible attempts to bolster the ALJ's decision through rationales not expressed in that decision or with evidence neither cited nor discussed in the context of weighing Dr. Calhoun's opinion. All in all, the administrative decision is so truncated on this issue that the Court cannot meaningfully review the ALJ's reasoning process nor be sure that the ALJ actually followed the appropriate analytical path. Those errors are not harmless, nor has the Commissioner argued that they are, and a remand is justified on that basis alone.

Although not strictly necessary, the Court will also attempt to offer some guidance on the other issues which plaintiff has raised. With respect to the ALJ's treatment of Dr. Dunmeyer's opinion, it is true that when dealing with a non-treating source, the ALJ is under no obligation to provide the same level of explanation of his or her reasons for discounting that source's opinions as would be the case with a treating source. See, e.g., Acton v. Commissioner of Social Sec., 2013 WL 3761126, *5 (S.D. Ohio July 16, 2013). On the other hand, plaintiff is correct that such opinions do require consideration under §404.1527(c), and the factors set forth in that regulation, such as how well the opinion is supported by "medical signs and laboratory findings," see §404.1527(c)(3), should be evaluated accurately. Again, the decision in this case does not provide much explanation for why, as the ALJ concluded, the findings made or considered by Dr. Dunmeyer were deemed inconsistent with her opinion; the reason offered, that the normal strength and good range of motion finding she made are not consistent with the limitations she imposed, is a conclusion rather than a reason, and appears to be supported by little other than the ALJ's medical judgment. A remand will give the Commissioner another opportunity to follow the dictates of §404.1527(c) with respect

to this opinion.

### B. The Mental Impairment

Plaintiff's second assignment of error is directed to the ALJ's evaluation of plaintiff's mental impairment. The record documents that plaintiff suffers from depression. The ALJ both found that it was not a severe impairment and did not impose any mental limitations on plaintiff when making his residual functional capacity finding (or when posing hypothetical questions to the vocational expert). Plaintiff contends that both of these decisions were erroneous.

At step two of the sequential evaluation process, an ALJ is required to consider whether the impairments identified in the record are "severe." For mental impairments, an ALJ must follow a special technique set forth in 20 C.F.R. §1520a, and ordinarily finds a mental impairment not severe if the ALJ "rate[s] the degree of your limitation in the first three functional areas as 'none' or 'mild' and 'none' in the fourth area." See §404.1520a(d)(1). The three functional areas are "activities of daily living; social functioning; and concentration, persistence, or pace," §404.1520a(c)(4), and the fourth is "episodes of decompensation," §404.1520a(c)(3). The ALJ followed that technique here and relied on both Mr. Sours' evaluation and a review of the records by a state agency reviewer, neither of which indicated more severe limitations in those four areas.

Plaintiff argues, however, that the ALJ erred by rejecting a more pessimistic assessment from Dr. Yee. Since Dr. Yee was, like Mr. Sours, an examining rather than a treating source, plaintiff's argument appears to be not that the ALJ was required to give Dr. Yee's views any special deference, but that substantial evidence did not support the ALJ's decision to adopt the findings of Mr. Sours and Dr. Rudy since they were not as consistent with the evidence as was Dr. Yee's.

This appears to be a situation where the ALJ was entitled to

-13-

make a choice between various opinions because each had some support in the record. As the Court of Appeals observed in Mullins v. Sec'y of HHS, 836 F.2d 980, 984 (6th Cir. 1987), "the weight to be given opposing medical opinions ... is clearly not a basis for our setting aside the ALJ's factual findings." If the ones chosen by the ALJ find "ample support in the record," id., a reviewing court may not disturb them. The fact that Dr. Yee's views find some support in the record does not mean that there is no support for opposing viewpoints. "In deciding whether to affirm the Commissioner's decision, it is not necessary that this court agree with the Commissioner's finding, as long as it is substantially supported in the record." Rogers v. Comm'r of Social Security, 486 F.3d 234, 24 (6th Cir. 2007). Plaintiff's arguments fail to persuade the Court that the opinions of Mr. Sours, who examined plaintiff, and Dr. Rudy, who reviewed the evidence (and whose opinion was later affirmed by another state agency reviewer, Dr. Steiger), were not substantial evidence, especially when viewed in the context of a significant period of time during which plaintiff sought no treatment for depression and when there was little evidence that it interfered with his daily functioning. While the ALJ may have overstated the weight he gave to Dr. Yee's GAF rating of 67 in finding her views internally inconsistent, see, e.g., Kennedy v. Astrue, 247 Fed. Appx. 761, 766 (6th Cir. Sept. 7, 2007), that rating is not irrelevant; Kennedy points out that it "may help an ALJ assess mental RFC," id., and a high GAF coupled with very restrictive findings about functional abilities may at least permit an ALJ to question the overall consistency of an examiner's opinion. Because that was not the only reason why the ALJ chose to credit the opinions of Mr. Sours and Dr. Rudy, however, any error in that regard is harmless.

    Plaintiff's other contention is that even if he suffered from only mild depression, the impact of his depression should

have been included in the hypothetical questions posed to the vocational expert.  The Commissioner's memorandum does not directly address this argument.  It is true that such hypothetical questions, in order to elicit testimony on which the ALJ may properly rely, must accurately recount a claimant's physical and mental impairments.  See, e.g., Varley v. Sec'y of HHS, 820 F.2d 777, 779 (6th Cir. 1987).  However, the case law strongly suggests that if a mental impairment is deemed not to be severe on the ground that it imposes, at most, only mild limitations in certain areas of functioning, an ALJ may omit reference of those limitations in the hypothetical question posed to the vocational expert.

     Plaintiff has not cited to any authority for the proposition that an ALJ commits reversible error by failing to include mild limitations identified at step two of the sequential evaluation process into the hypothetical questions posed to a vocational expert.  A number of courts have reached just the opposite conclusion.  For example, in Burroughs v. Astrue, 2011 WL 2604771, *7 (N.D. Ohio July 1, 2011), the court affirmed the ALJ's finding that a claimant did not have a severe mental impairment based on a state agency reviewer's conclusion that the plaintiff had only mild limitations in mental functioning, and then observed that "the ALJ was not required to incorporate such a limitation into the hypothetical question he posed to the vocational expert."  See also Morgan v. Astrue, 2012 WL 92494, *7 (S.D. Ga. Jan. 11, 2012)("the ALJ was not required to include Plaintiff's non-severe mental impairments in his hypothetical questions to the VE"); Marbury, Jr. v. Astrue, 2010 WL 3220039, *12 (W.D. Pa. Aug. 12, 2010)(ALJ who determined a mental impairment was not severe "was justified in omitting mental health limitations from the hypothetical").  Further, the findings made by use of the "B" criteria used to evaluate a mental impairment at step two of the process are not the

-15-

equivalent of a functional capacity evaluation.  See Hensley v. Astrue, 2008 WL 1026237, *7 (E.D. Ky. Apr. 9, 2008)("the "B" criteria are not intended to be a residual functional capacity assessment").  Therefore, the ALJ did not have to adopt the limitations identified at that step of the process when crafting his residual functional capacity finding.

    Interestingly, even in the reverse situation, where a mental impairment is found to be severe, one Judge of this Court has held that if severe mental impairments cause only mild restrictions on functioning, the ALJ properly concluded that the impairments "were mild enough so as not to warrant specific limitations in her RFC."  Walker v. Astrue, 2012 WL 3187862, *5 (S.D. Ohio Aug. 3, 2012)(Newman, M.J.), adopted and affirmed 2012 WL 3755606 (S.D. Ohio Aug. 29, 2012).  While that may be an unusual situation, it illustrates the absence of any hard and fast rule that an ALJ must incorporate limitations caused by a non-severe impairment into the hypothetical question posed to the vocational expert.  In some cases, the failure to do so may be erroneous - for example, where the record compels a finding of functional limitations which ought to be considered in determining a claimant's ability to work - but plaintiff has not really made that argument, and it is not this case.

## VII.  Recommended Decision

    Based on the above discussion, it is recommended that the plaintiff's statement of errors be sustained to the extent that the case be remanded to the Commissioner pursuant to 42 U.S.C. §405(g), sentence four.

## VIII.  Procedure on Objections

    If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s).

A judge of this Court shall make a <u>de novo</u> determination of those portions  of the report or specified proposed findings or recommendations to which objection is made.  Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions.  28 U.S.C. §636(b)(1).

     The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation <u>de novo</u>, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation.  <u>See Thomas v. Arn</u>, 474 U.S. 140 (1985); <u>United States v. Walters</u>, 638 F.2d 947 (6th Cir. 1981).

                                             <u>/s/ Terence P. Kemp</u>
                                             United States Magistrate Judge